UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 15-20022 |
| | ) |
| DANIEL BALLARD, | ) |
| | ) |
| Defendant. | ) |

# ORDER AND OPINION

This matter is now before the Court on Defendant Ballard's Motion [40] for New Trial. For the reasons set forth below, Defendant's Motion [40] is GRANTED.

### BACKGROUND

**A. Ballard's Indictment and Trial**

On June 2, 2015, Defendant Ballard was charged by way of indictment with three counts of bank fraud, in violation of 18 U.S.C. § 1344. Count 1 of the indictment alleged that on July 28, 2010, Defendant executed a scheme to defraud the state Bank of Herscher ("Bank") by causing to be submitted to the Bank a Contractor's Statement claiming that various contractors had furnished material or labor in the amount of $56,000 to the premises at 411 North Center, Bradley, Illinois, knowing that the listed contractors had not provided materials or labor in that amount to the 411 North Center address. Count 2 alleged that on November 24, 2010, Defendant executed a scheme to defraud the Bank by submitting a Contractor's Statement claiming that various contractors had furnished materials or labor in the amount of $67,899 to the premises at 248 North Center, Bradley, Illinois, knowing that the listed contractors had not provided materials or labor in that amount to the 248 North Center address. Count 3 alleged that on December 13, 2010, Defendant executed a scheme to defraud the Bank by submitting two

1

Contractor's Statements claiming that various contractors had furnished materials or labor in the amount of $107,301 to the premises at 411 North Center and 248 North Center, knowing that the listed contractors had not provided materials or labor in that amount to those premises.

The United States alleged that Ballard used the funds from the North Center properties to complete construction at the 3013 Stone Fence premises, which was financed—apparently insufficiently—by a separate construction loan. Defendant obtained each of the construction loans through the Bank's loan officer, Joe Grant. Defendant testified at trial that he did not read any of the multiple loan documents and implied that someone else signed his name to them. The United States called Joe Grant, the Defendant's loan officer at the Bank, as a witness. Grant testified to the existence of the loans, the Defendant's alleged fraudulent conduct in not using the loan proceeds as represented, and purported admissions made by Defendant to Grant and the Bank's president. On December 2, 2016, the jury found Defendant guilty of all three counts. Jason LeBeau, currently a Special Agent with the Federal Deposit Insurance Corporation, and Eugene Miller, Assistant United States Attorney for the Central District of Illinois, led the investigation and prosecution of Ballard.

**B. Defendant's Motion for New Trial**

On February 8, 2017, Defendant filed a Motion for New Trial. Doc. 40. Defendant's Motion alleged that the United States suppressed information that Grant was the subject of a federal criminal investigation regarding criminal activity at the Bank at the same time the loans were issued in the instant case. Specifically, Defendant alleges that one day after the conclusion of Ballard's trial, Defense counsel was contacted by Scott Fitts, who advised him of an undercover investigation targeting Grant. Fitts, who was investigated, indicted, and later pleaded guilty to charges including structuring transactions to avoid reporting requirements, informed

counsel that he had surreptitiously recorded Grant making admissions about his involvement in falsifying paperwork at the Bank to deceive investigators.

Defendant's Motion states that "when Mr. Grant testified in the instant trial, he had been aware he had been the target of the government investigation," and the defense was therefore entitled under *Giglio* to the evidence of bias, i.e., "Grant testified the way he did to curry favor from the same people who had previously been investigating criminal conduct on his part." Doc. 40, at 5. Further, Defendant asserts that "if criminal conduct was indeed uncovered by the government in that investigation, that information is *Brady* material which directly could suggest innocence on the party of the defendant." Because Grant was "the only witness that contradicted the defendant's testimony that Mr. Grant told the defendant to do what he did," Grant's credibility was "crucial to the government's case." *Id*. Defendant's Motion goes on to state:

> When this court inquired how the defense could indeed connect criminal activity to Mr. Grant, the defense did not have the direct connection because evidence of the connection had been intentionally suppressed by the government. *Brady* and *Giglio* expressly constitutionally precludes as a matter of due process any such governmental suppression. 18 U.S.C. § 3500 expressly provides a procedure if the government believes such material is not relevant. The procedure requires the government to produce the material in-camera so that the court can determine relevance. If the government refuses to so provide the material a mistrial is in order. *See* 18 U.S.C. § 3500(c) and (d).

Doc. 40, at 5.

The Government's response states that following Ballard's post-trial motion "the United States requested any recordings involving J.G. in the custody of the Federal Bureau of Investigation or the Internal Revenue Service related to the Fitts investigation," but notes that "while the FBI and IRS were involved in the Fitts investigation, neither agency was part of the prosecution team in the Ballard investigation, which involved the FDIC." Doc. 46, at 4. The FBI subsequently provided the U.S. Attorney's Office and FDIC Agent Lebeau with a copy of the

3

April 22, 2009 recording made by Fitts of a conversation with Grant. The United States provided the recording to the Court for an in camera inspection. On March 20, 2017, the Court entered a text order indicating that it had reviewed the recording and determined that the conversation contained enough potentially relevant information to warrant turning it over to the Defense. With leave of court, Defendant filed a supplemental motion (Doc. 47), to which the United States responded (Doc. 49). It is that recording which is the subject of these proceedings. On April 13, 2017, the Court held a motion hearing, ordered supplemental briefing, and set the matter for an evidentiary hearing. On May 24, 2017, the defense filed a Motion for the transcript of an in camera proceeding (Doc. 54) pertaining to Scott Fitts in Case No. 08 CR 2003. The Government responded on June 1, 2017 (Doc. 55), and the Court, after reviewing the transcript in camera, denied the Defense request on June 6, 2017. The evidentiary hearing then proceeded as scheduled on June 9, 2017. This order follows.

## LEGAL STANDARD

Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution." 373 U.S. at 87; see also *Kyles v. Whitley,* 514 U.S. 419 (1995). "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [*Brady's*] general rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264 (1959)).

In order to prevail on a motion for new trial alleging a *Brady* violation, the defendant must show: "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *United States v. Morris*, 80 F.3d 1151, 1168–69 (7th Cir. 1996) (quoting *United States v. Silva,* 71 F.3d 667, 670 (7th Cir. 1995)). Under the first *Brady* requirement, the Government suppresses evidence "when 'the prosecution fails to disclose the evidence in time for the defendant to make use of it' and 'the evidence was not otherwise available to the defendant through the exercise of reasonable diligence.'" *United States v. Shields*, 789 F.3d 733, 747 (7th Cir. 2015), *cert. denied,* 136 S. Ct. 420 (2015), quoting *Ienco v. Angarone,* 429 F.3d 680, 683 (7th Cir. 2005). Under the second *Brady* requirement, evidence favorable to the defense includes both material which tends to be exculpatory and material which may be used to impeach or discredit government witnesses. For purposes of *Brady*, there is no distinction between impeachment and exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio*, 405 U.S. at 154. Under the third *Brady* requirement, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682; *United States v. Mota*, 685 F.3d 644, 648 (7th Cir. 2012).

## ANALYSIS

In his Supplemental Motion, Defendant states:

> [Ballard's] sole defense [at trial] was that defendant acted in good faith. He had a conversation with Loan Officer Joe Grant in which they discussed defendant moving resources from one project to the other. Joe Grant told defendant, "do what you have to do," or similar such words. In a specific effort to counter that defense, the government put Joe Grant in front of the Grand Jury to deny that conversation and specifically called Joe Grant at trial as a key witness to deny that conversation. The government adroitly suppressed evidence that Joe Grant had previously been granted benefits by the very same prosecutor in the instant case.

5

> One benefit was this same prosecutor's decision to pass on prosecuting Joe Grant for illegally structuring a "19,000.00 bank deposit at the same victim bank at the same general time of the loan transactions in the instant case. The prosecutor also benefited Joe Grant when the prosecutor decided to pass on prosecuting Joe Grant for cause a Suspicious Activity Report (SAR) to be falsified at the same victim bank. Finally, Joe Grant acknowledged that he accepted signed blank loan applications which specifically comported to defendant's testimony in the instant trial. The government intentionally suppressed a tape recording of Joe Grant in which Joe Grant either expressly admits or tacitly acknowledges the illegal activity mentioned above. Hiding that tape successfully hampered the effective cross examination of government witness Joe Grant.
>
> Doc. 47, at 1-2.

Additionally, Defendant argues that "[h]ad the jury disbelieved Joe Grant when he denied the conversation then the jury could have found the defendant acted in good faith." Therefore, Defendant asserts, "[i]t is impossible to rely on falsities in documents when both parties are fully aware of the falsities." *Id*. at 2.

In response the United States argues that Ballard never asserted a "good faith" defense, because:

> At trial, the defendant never claimed he honestly believed that the representations in his sworn contractor's statements were true; the trial evidence showed that they were not true and the defendant knew it. Instead, he simply claimed that he did not sign the statements or did not read them before signing them. Because the trial evidence overwhelming[ly] showed that the representations in the sworn contractor's statements as to the work done at the subject properties were false and fraudulent, good faith was not a viable defense during the trial. Thus, the United States did not call [Grant] to testify "in a specific effort to counter a good faith defense (Def.Supp.¶1). Instead, it called [Grant] as a witness because he was the bank's loan officer for the defendant's fraudulent loans. [Grant's] testimony established the existence of the loans, as well as the defendant's fraudulent conduct in not using the loan proceeds as represented and the defendant's admissions to [Grant] and the bank president. [Grant] would have been called by the United States to testify before the grand jury and in its case-in-chief, regardless of the nature of the defense offered by the defendant.
>
> Doc. 49, at 3.

6

In addition to the United States' argument that (1) Defendant did not assert a good faith defense, it also argues that (2) Grant did not receive any "benefits" from the United States in exchange for testifying; (3) defense counsel was aware of Grant's role in the Fitts investigation; (4) the recording was not intentionally suppressed because it was in the possession of the FBI, which was not part of the "prosecution team" in the Ballard investigation; and (5) the statements made by Grant in the recording are neither favorable to the defense not material to any issue at trial.

A brief analysis of the Fitts' investigation is required. An interesting side note is that Fitts is not a stranger to any of the main players in the Ballard case, those being Beaumont, LeBeau, Miller, and Grant.

During their investigation of Fitts in July 2007, FBI agents notified attorney Beaumont, who then represented the Grant Park Police Department, that they wished to inspect and count the money ($38,934) that Fitts had stated was kept in a cardboard box inside the GPPD vault. Before the agents could count the money, Fitts obtained a personal loan for $35,100 from the State Bank of Herscher and requested the loan be paid by three checks made out to him for $9,000, one check for $8,000, and $100 in cash. Joe Grant was the loan officer Fitts used for the $35,100 loan. Three days later, on July 19, 2007, the agents counted $38,934 in cash inside the GPPD vault. Months later, after the agents learned about Fitts' structured loan, they contacted Grant, who was then represented by attorney Royal B. Martin. Martin made Grant available to the agents and Grant provided information regarding Fitts' structuring of the proceeds. According the Government, "the United States accepted Martin's and [Grant's] representations that, because [Grant] knew that Fitts was both the Chief of Police of the GPPD and a federal agent with the Department of Labor when Fitts obtained the loan, [Grant] had no reason to believe that Fitts had

7

any criminal intent in obtaining the loan. Thus, the United States considered [Grant] a witness in the federal grand jury investigation of Fitts." Doc. 46, at 6.

The charges in Fitts' indictment included five counts of wire fraud, making a false statement, obstruction of justice, income tax evasion, and two counts of structuring. One structuring charge related to the 2007 loan Grant issued to Fitts from the State Bank of Herscher; the other structuring charge related to a loan Fitts obtained in 2006 from Homestar Bank and was also issued by Grant. According to Fitts, Special Agent LeBeau, then working for the Internal Revenue Service, authorized and directed Fitts, who by that time was cooperating with the United States in hopes of receiving a lesser sentence, to record his conversation with Grant. The recording took place on April 22, 2009. The United States contends that none of the recordings made by Fitts, including the Grant recording, substantially assisted the United States in the investigation or prosecution of any individual. Therefore the United States did not request a downward departure for substantial assistance at Fitts' sentencing. Assistant United States Attorney Eugene Miller prosecuted Fitts.

**(1) Whether the Prosecution Suppressed Evidence**

Defendant contends that the United States withheld evidence in violation of *Brady v. Maryland* and *Giglio v. United States* by failing to disclose information regarding the interview and recording of Grant during the Fitts investigation. The Government suppresses evidence "when 'the prosecution fails to disclose the evidence in time for the defendant to make use of it' and 'the evidence was not otherwise available to the defendant through the exercise of reasonable diligence.'" *Shields*, 789 F.3d at 747 (quoting *Ienco*, 429 F.3d at 683). "[T]he Government has an affirmative duty to learn of and to disclose any favorable evidence" to the defendant. *Id*. However, "the defendant bears the burden of establishing a *Brady* violation by

offering more than mere speculation or unsupported assertions that the Government suppressed evidence." *Id*.

The Government's obligation to disclose evidence favorable to the accused extends beyond the prosecutor assigned to a case. Rather, "[t]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995); see also *United States ex rel. Smith v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985) (*Brady* rule violated where police, rather than prosecutors, were responsible for suppression of exculpatory information). However, "neither *Kyles* nor *Fairman* can be read as imposing a duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue." *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996). Thus, the Government does not withhold favorable evidence when the agency or official in possession of the material is not considered part of the prosecutorial team. See *United States v. Muoghalu*, 662 F.3d 908, 910 (7th Cir. 2011) ("So there was no withholding of exculpatory material unless the HHS investigators should be considered part of the prosecutorial team in this case.").

Here, the United States asserts that Fitts' recording of Grant was done at the behest of the FBI and IRS. The Government states that the FBI provided the recorder to Fitts, reviewed the tapes, and maintained custody of the recordings. Thus, the Government argues that "[b]ecause the FBI was not involved in the Ballard prosecution or part of its 'prosecution team,' the recording could not have been 'intentionally suppressed' by the United States in the instant case." Doc. 49, at 12.

The Government is correct, to a point. In the Fitts case, the FBI and IRS conducted the investigation and prosecution; in Ballard's case, it was the FDIC, not the FBI or IRS, that was involved in his investigation and prosecution. But Special Agent LeBeau and Assistant United States Attorney Miller were involved in the investigation and prosecution of both Fitts and Ballard, therefore the line isn't as neat and clean as may normally be the case. Although the FBI was the agency that was primarily responsible for providing Fitts with the recording device, reviewing the recordings, and maintaining custody of the tapes (Doc. 49, at 11), Agent LeBeau interviewed both Joe Grant and Scott Fitts, and had knowledge of, and may have directed, the Fitts recording of Grant as well as taking custody of the CD recording for transferring back to the FBI.

*Kyles* held that "[t]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." 514 U.S. at 437–38. Here, Defendant has shown that Special Agent LeBeau, who was operating on the Government's behalf, knew that Grant was recorded by Fitts as part of Fitts' cooperation agreement. Special Agent LaBeau was also acting on the Government's behalf in the instant case. Thus, while *Morris* does not impose "a duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue," 80 F.3d at 1169, that rule is inapplicable here because Special Agent LaBeau was part of the prosecution team against both Fitts and Ballard and, as set forth above, knew that Fitts recorded a conversation with Grant regarding Grant's loan practices. See *Kyles*, 514 U.S. at 438 ("Since, then, the prosecutor has the means to discharge the government's *Brady* responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and

10

even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials."). The Defense argues that the conduct of the Government was intentional. The Court does not agree. There is no evidence to be ascribed to Agent LeBeau (or AUSA Miller) to warrant that finding. In fact, the investigations were years apart, memories fail and certainly there were many investigations in between. However, given the facts as set out above the Court finds the information was such that it was in possession of the Government and not otherwise available to the Defense through the exercise of reasonable diligence. Because the Court finds that the Government suppressed information about Grant, the next inquiry is whether that information was favorable to the Defense.

**(2) Whether the Evidence was Favorable to the Defense**

Evidence favorable to the defense includes both exculpatory evidence and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio*, 405 U.S. at 154. Here, Defendant argues that the Grant recording is favorable to the Defense, and the Government's suppression of the recording prevented Defense counsel from effectively cross-examining Grant about his bias. Specifically, Defendant argues that Grant was given benefits by AUSA Miller when the prosecutor decided to pass on prosecuting Grant for illegally structuring a loan for Fitts and illegally causing a Suspicious Activity Report ("SAR") to be falsified at Hersher State Bank. Further, Defendant argues that the recording indicates "Joe Grant acknowledged that he accepted signed blank loan applications which specifically comported to defendant's testimony in the instant trial." Doc. 47, at 1-2. Thus, Defendant argues that "[t]he government intentionally suppressed a tape recording of Joe Grant in which Joe Grant either expressly admits or tacitly acknowledges the illegal activity mentioned above" and "[h]iding that tape successfully hampered the effective cross examination of government witness Joe Grant." *Id*.

11

In response, the United States argues that Grant was never given any benefits by the prosecutor because the decision not to prosecute Grant was based on a lack of evidence of criminal wrongdoing. The United States asserts that Grant was a witness—rather than a target or suspect—in the Fitts investigation. Finally, the United States argues that:

> [Grant's] prior statements related to the Fitts investigation are not favorable to the defense because they could not be used for impeachment. [Grant] did not make any credible statements admitting to falsifying bank records, as claimed by the defendant. To the contrary, through counsel, [Grant] denied any knowledge of Fitts's criminal intent to structure (i.e., to avoid the filing of a Currency Transaction Report), given that Fitts was a state and federal law enforcement officer at the time; the United States ultimately accepted [Grant's] and his counsel's representations. Moreover, the recording made by Fitts during his in-person meeting with J.G. to attempt to obtain a sentence reduction did not result in any admissions of wrongdoing by [Grant].

Doc. 46, at 12-13.

After a careful review of the Grant recording, the Court finds that Grant's prior statements relating to his involvement in the Fitts investigation constitute evidence that would have been favorable to the Defense at trial. First, regardless of the Government's characterization of Grant as a mere witness in the Fitts investigation, it is clear that Grant himself thought he was under investigation. See Doc. 49-1, at 34, 37. Second, Grant's statements to Fitts regarding the Bank filing a SAR report are favorable to the Defense. Specifically, those statements suggest that Grant or an employee under his direction falsely indicated on the SAR report that the checks issued to Fitts were for "Heilig Furniture." *Id*. at 18.

Third, Grant, while serving as a loan officer at Herscher State Bank, notified Fitts that a SAR had been created for one of his transactions. According to the Government's own brief, disclosure of the existence of a SAR is prohibited under the Bank Secrecy Act. Doc. 49, at 16, n.11. Indeed, 31 U.S.C. § 5318 expressly prohibits financial institutions and their employees from notifying "any person involved in the transaction that the transaction has been reported."

12

This appears to contradict the Government's contention that it did not investigate Grant because it had no knowledge of wrongdoing, and lends some support to Defendant's position that Grant was given a benefit in exchange for favorable testimony. Finally, Defendant's assertion that "Joe Grant acknowledged that he accepted signed blank loan applications which specifically comported to defendant's testimony in the instant trial" appears to be at least partially supported by Grant's statements in the recording. See *id*. at 18. Viewed as a whole, the recording contains ample fodder for impeaching Grant's credibility, and is thus favorable to the Defense.

**(3) Whether the Evidence was Material to an Issue at Trial.**

*Brady's* third condition requires that the suppressed evidence would have been material to an issue at trial. This means that "it was evidence that (if disclosed in a timely way) would have created a reasonable probability of a different result." *United States v. Wilson*, 237 F.3d 827, 832 (7th Cir. 2001) (citing *Kyles*, 514 U.S. at 434). "Bank fraud under § 1344(2) requires the government to prove that there was a scheme to obtain money from the bank and that the scheme involved a materially false or fraudulent pretense, representation, or promise, in addition to elements two through four necessary under § 1344(1)." *United States v. Ajayi*, 808 F.3d 1113, 1119-20 (7th Cir. 2015).

Defendant argues in part that "[h]ad the jury disbelieved Joe Grant when he denied the conversation then the jury could have found the defendant acted in good faith." Therefore, Defendant asserts, "[i]t is impossible to rely on falsities in documents when both parties are fully aware of the falsities." Doc. 47, at 2. The Government is correct that a bank employee's negligence or consent is not a defense to bank fraud. See *United States v. Berman*, 21 F.3d 753, 757 (7th Cir. 1994) ("[C]ontributory negligence is not a defense to fraud."); *United States v. Peterson*, 823 F.3d 1113, 1123 (7th Cir. 2016) (ostrich instruction proper when defendant argued

13

that the Bank's approval of draw requests suggested his conduct was proper). However, the Government also acknowledged that Ballard "simply claimed that he did not sign the statements or did not read them before signing them." Although the Government characterizes this defense as implausible, it may have been a much more plausible defense had the Government turned over the Grant recording prior to trial. The Defense was entitled to cross-examine Grant about his credibility, and had the jury found Grant incredible, it is not a stretch to see the verdict could have been different. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [*Brady's*] general rule." *Giglio*, 405 U.S. at 153–54. In sum, the Court finds that the Government suppressed evidence that was favorable to the Defense and material to an issue at trial. Accordingly, the Court finds that the interest of justice requires a new trial. Ballard's conviction is therefore vacated. The Court will contact the parties for the purpose of scheduling a new trial date.

## CONCLUSION

For the reasons stated above, Defendant's conviction is VACATED, Defendant's Motion [40] is GRANTED, and a new trial is ordered.

Signed on this 13th day of June, 2017.

<u>s/ James E. Shadid</u>
James E. Shadid
Chief United States District Judge